We are here to hear argument in two cases, United States of America v. Yusuf and United States of America v. Campbell. This is not the rare instance, but the not ordinary instance of an appeal by the United States, appeals by the United States. And so we will first hear from counsel from the Assistant United States Attorney, Mr. Ramsey. Mr. Ramsey These appeals are about a broken promise. The government bargained for a united sentencing recommendation and didn't get it. As for Mr. Yusuf, he agreed not to seek a sentence below 21 months. He asked for five and got six. For Mr. Campbell, he agreed not to ask for a sentence below 30 months. He asked for zero and got 12. Let me start not with the nuts and bolts in the record of whether or not what occurred in either case was a breach, but what is, I concede, more of a policy issue. Is there any concern on the part of the government that were we, the Third Circuit, to decide either or both of these cases in such a way that we either were condoning what occurred that the government, that the prosecution in future cases might be more, not only more cautious, but perhaps unwilling to bargain and enter into plea agreements. And more particularly, even if the case went back to a district court and the parties were left to have to either proceed to trial or enter into another plea agreement, that the government, after having been, in its view, burned in the previous proceeding, been burned, that the government would take a harder stance, a more difficult position, at least as far as the defense is concerned. That's true, Your Honor. I would think, at least the government is here on principle. And if we are to allow defense attorneys and defense defendants themselves to breach plea agreements without them being held accountable, the government is in a difficult position when it comes to plea bargaining. It's not in the government's interest to pursue plea bargaining if the plea agreements are not going to be enforced on the back end. So what should defense counsel do when she or he is put on the spot by a district court and asked questions which seem to seek answers that would be advocacy contrary to the provisions of the plea agreement? Well, that was the issue in Nolan Cooper, and what the court instructed there is that defense attorneys have to tell the court that the answer that is going to be required of them is going to breach the plea agreement, and they're not going to be able to answer that question. Is that what Nolan Cooper really says? Are you saying that any time a court asks about facts that they just have to dummy up, they can't say anything? Let's focus on the Yusuf case for a second. In fact, let me direct your attention to page 328 in the Joint Appendix at Volume 3. This is under the stipulations paragraph of the plea agreement, and there is like language in the Campbell one. It says, if this office obtains or receives additional evidence or information prior to sentencing that it determines to be credible and to be materially in conflict with any stipulation in the attached Schedule A, this office shall not be bound by any such stipulation. What is defense counsel to do when there has been a material change in fact? That is, there's been sentencing of other defendants, there's a clear disparity and a pretty dramatic one, and the defense counsel is asked directly about that. The government is reserved to its right and the opportunity to speak to material facts. Is the government's position really that if material facts have come into being and a defense counsel is asked directly about them, they can't answer the question of the court without being in breach of a plea agreement? No, that's not what we're saying, Judge. In fact, in Nolan Cooper, that issue came up where there were factual disputes and the court said that an attorney can correct a factual issue, but that's not what happened in Yusuf. The issue of Mr. Adekunle's sentence was already in the PSR. There was nothing that any party disputed when it came to that issue. But the district court wanted to know about it, asked specifically. It was pressing the defense counsel about it. And when counsel for the government quite rightly stood up and said, I think this is in conflict with the plea agreement, the district court said, look, I'm asking the questions here, I need to know. We're in Judge Weiss's policy dissent in Williams where he says the district court has a job to do and if the government is preventing defense counsel from doing his or her job, the district court can't do its job. It's a statutory mandatory job. What's the government's response to that argument? Well, counsel in this case could have done something very simple. He could have directed the district judge to the PSR, Mr. Yusuf's PSR, where it's already indicated that Mr. Adekunle had a two-month sentence and a 10-month for home detention. And at the end of that statement, counsel could have asked the district court to impose a sentence at the bottom of the guidelines. That's where the proportionality argument ends. Why would it end there? Because by asking for a sentence at the bottom of the guidelines, the judge is concerned about proportionality. If the judge, if she imposes a sentence at the bottom of the guidelines, that concern is not addressed because she's imposing a sentence which she is concerned will be disproportionate to a similarly situated or even more culpable or equally culpable co-defendant. And Judge Hayden had the right and the discretion, excuse me, to make that decision. But we're talking about advocacy here. And a defendant and his or her attorney are bound by the terms of the plea agreement. We're not meeting here, Mr. Ramsey, on the point that I think we're all trying to get you to speak to, I'm certainly trying to get you to speak to, which is counsel have a responsibility to their clients, certainly, but also to the court. They have a part to play in assisting the court. And that involves answering questions that the court puts to them and weighing 35, 50. I mean, if the judges could do this on their own, why would we bother having you guys come into the courtroom, right? We have you come into the courtroom because you have a part to play, you generically, not you individually, but right? Lawyers, advocates have a part to play in assisting the court to understand how to weigh and apply the 35, 53A factors. If the government's position is defense counsel may not play that part, they may not speak in response to the government's, the questions that the court puts to them, are you not preventing the court from fulfilling its obligation by taking one of the players out of the mix? Well, that would undermine the plea agreement to begin with. We're not talking about every case where there's no plea agreement. We're talking about cases that a plea agreement is in place. Should the... Go ahead, Judge McKee. No, go ahead, Chief. I just said that doesn't answer the question. He's obviously only asking you about cases where there are plea agreements. And by standing mute, counsel is not responding to the judge's concerns or the judge's inquiry. Well, again, I can only refer the court to Nolan Cooper where that was the case and the government got dinged for making extra remarks that were later construed to be in violation of the plea agreement. Could the judge, the sentencing judge, you're at the sentencing proceeding as we have here, simply say, okay, I know that I approved the plea agreement pursuant to Rule 11 back in such and such a day. I now reject the plea agreement. Let me hear from both sides. Where does that leave you? Well, I think at that point, I think the court would have had to advise the government that it would be rejecting the plea agreement. Are we talking about at the sentencing? Yes. Yes. I think that the government would have had to have had an opportunity to brief that issue to address whatever 3553A factors were going to be in place. I agree with you, but if I'm following you here, hasn't the government similarly had, for lack of a better characterization, a reliance interest in terms of where this proceeding was going even without the plea, even without the agreement having ultimately been rejected? Events as they unfolded in the courtroom at the sentencing permitted argument that the government, I presume, was expecting would not be permitted, given the explicit terms of the plea agreement. That's correct, Judge. I guess I missed the question in there. Well, is the fact that the judge is making an inquiry... Well, let me phrase this differently. You said in answering Chief Judge Smith's question, well, then the government would have wanted the opportunity to speak to the 3553A factors. And that just confuses me a little bit, because doesn't the government always have a responsibility to speak to the 3553A factors? I mean, the fact that there's a plea agreement doesn't mean that the government gets to say... Unless you've got a C plea in place that everybody has agreed to and that the court has acknowledged it's bound by. Absent a C plea, the government has to speak to it in every case. How could the government be prejudiced by saying, hey, we had no idea we were going to be talking about the 3553A factors? That's in every case, isn't it? That's true. And both defense counsel and the government have to speak to those factors at any sentencing proceeding. Of course, we're dealing with a plea agreement, and we're bound by the range that both defendants agreed would be applicable to them. And that, at least in part, is why you don't challenge the argument that it was appropriate to argue for leniency here. Correct. Because leniency very well could be the very bottom of the agreed-upon sentencing guideline. Correct. Well, leniency could be outside the range. I mean, you've acknowledged, you acknowledge in print, in your brief, you acknowledge in the plea agreement, says you have to, that the district judge is free to do what the district judge does. So are we talking about just kabuki here, a motion that where everybody has to speak to it? Where everybody knows something else is meant? Where the defense counsel can't speak and say, look, co-defendant here got two months. Bottom of the range is 20 months. We'd ask for leniency. Sit down. Would that have been all right? Not unless the additional statement was made that counsel wanted a sentence within the range that was specified, deriving from, I believe it was an offense level of 14 in that case. So you're saying that then defense counsel has an obligation to say, we want a sentence within. It's not enough for them to say, we acknowledge there's a plea agreement. We acknowledge we're bound by the plea agreement. We just think it's important for the court to know since the plea agreement, so-and-so has been sentenced. There's two months there on that sentence. We'd ask for leniency. Leniency is okay, Judge. We're not saying that leniency is not okay. But we are saying that leniency does have a point when a plea agreement like this one is in place. But it's up to the judge to determine that point. I'm sorry, Judge? But it's up to the judge to determine that point, what is leniency. Oh, absolutely. Okay. So why isn't it okay to simply say, point out the difference in the sentence and then just say, the plea agreement here, as you know, Your Honor, is within the guideline range, the bottom part of which is 21 months. We would ask for leniency. Now, that to me seems to be consistent with counsel's obligation. But also saying to the court, look, if you think leniency is the bottom of the range, fine. We've agreed to that. We're not going to object to that. If you think leniency is going below that, that's your call, Judge. I don't understand how that would be dereliction of the plea agreement under Nolan Cooper or under Williams. Well, again, I would refer the court to Nolan Cooper where the court says that if you're giving the district judge a reason to reject the stipulation that's in the plea agreement, that's foul play. And that's what happened here. Well, the plea agreement does more, goes a lot farther than state an agreed upon range or an agreed upon 18 level, right? I mean, the agreement extends to constraining what both parties can do, can say, can advocate for in the courtroom, right? Correct. So, I mean, we will have to write an opinion in this case, whether it's a precedential opinion or a non-precedential opinion. And the government has taken the step, which is not the, I don't want to say the usual course, it doesn't occur all the time by any means when the government has an adverse ruling, of taking an appeal. Do you want us to provide some guidance here to defense counsel or to district courts or both as to how proceedings of this kind, how sentencing proceedings should be conducted pursuant to sentencing, pursuant to plea agreements that say what this plea agreement said? We think that that would be helpful. The court is up. What do you want us to say? How do you want us to guide district courts and or defense counsel? Well, counsel at large. Well, one of the things I guess for in terms of district judges is to be mindful of plea agreements and questions that may induce or that may suggest that defense counsel or the government for that matter could make an argument that would breach that plea agreement. As for defense counsel and for the government, an opinion that would explain the bounds of what we are able to argue. I mean, in Williams, the court has already said that it's a constraint on advocacy and not the sentencing discretion of the district judge. I think that's clear. I'm still waiting to hear you address the fundamental problem, which I think comes up in cases like this. And maybe Campbell and Yusuf are not similarly situated. I'll be interested to explore that with their attorneys. But you've got to. It appears you've got a basic conflict when you say, well, we're not trying to constrain the district court judge. But if what you say is and I know you wouldn't say quite like this, but if what you're getting at is the plea agreement muzzles defense counsel. Defense counsel may not speak in any way which would give the district court a reason to depart or vary. Then are you not in effect constraining the district court because you're taking a crucial stream of information away from the district court in making the decision? There's a tension there. There's a rub there that the government doesn't seem to be squaring up to with all due respect. I don't think that the district judge is in any way constrained by the inability of either the government or defense counsel to bring a line of argument that would breach a plea agreement. You say to bring a line of argument. It's entirely appropriate for the district court to say something or for the district court itself to say something or for the district court to ask or encourage counsel to say something or advocate. The district court certainly has discretion to do what it wants to do. Everybody agrees on that. The district court, I would hope, would not ask counsel questions whether it be of the government or defense counsel. But you can't constrain what a district judge says. So your emphasis has got to be directed toward counsel. The advocacy, correct. And that has to be constrained if we're dealing with a plea agreement like the ones that we're dealing here. Yes, I understand we're in the contract realm here, but it strikes me that looking at plea agreements in terms of traditional contract law is one of the many fantasies that the law engages in out of convenience or necessity or whatever. But I mean, it's a contract. It's not a contract, but we're stuck with it. We've said that, Supreme Court has said that, but given the limitations of the circumstance, what if the judge would ask? We're talking in terms of limitations on counsel. Counsel doesn't sign the agreement. Defendant signs the agreement, although maybe counsel did sign the agreement. Okay, so let's say the judge asks, and I don't know how many sentences I imposed in state court, but probably into the thousands of them because of the kind of cattle run that exists in Philadelphia criminal courts in all larger cities, which cases just come parading through, including homicides. I couldn't imagine imposing a sentence on somebody without engaging in a pretty protracted discussion with the defendant. If the defendant has any people there, family members especially, I want to hear from them. If the defendant's mother is there, I want to hear from her. Heaven forbid, unfortunately, it's a very, very rare case where a father shows up, but if a father shows up, I want to have a pretty involved discussion with the defendant's father, but I really want to get into a dynamic with the defendant. Now, you can interpret this language, it is specified that neither party will argue for the imposition of a sentence outside the guideline range. The parties agree not to seek or argue for any upward or downward departure, adjustment, or variance. What if I would ask the defendant, you tell me about yourself, I want to know about you, I want to know if I cut your break here one, what have you done to deserve it? I want to have the discussion with him. Now, that's kind of what happened in Campbell's case, and it's ironic because I find Campbell's counsel just in flagrant breach of the plea agreement. I mean, USAS was a little bit closer, but Campbell's counsel will hear from him. It's kind of outrageous what he did, given the plea agreement. But why wouldn't the judge be able to hear from defendant, and do you really expect the defendant to say, well, Your Honor, I understand that I signed this contract, and maybe it's a contract of adhesion, but I'm bound by it nevertheless. So, I'm not going to answer your question, Judge, I'm not going to tell you why you shouldn't impose a prison sentence on me. That is the ultimate fantasy, we're in Tinker Bell land when we get into that kind of scenario. And I would agree that that would be too much of a constraint on what, at least, are you talking about the allocution of the defendant, Judge? Yeah, well, that's the way I'm reading this agreement, he can't, she can't argue for any upward or downward departure, adjustment, or variance, can't seek it. And I'm going to ask the defendant, tell me why I shouldn't impose an incapacitative sentence, or some kind of incarceration. Why shouldn't I give you probation? Well, I think that any district judge would be looking at the plea agreement, and hopefully not asking questions that would encourage a defendant to breach that plea agreement. Now, if there are questions... I'm telling you, this judge wouldn't. I'm looking at the plea agreement, and that's important. But I want to have a discussion with the defendant, especially if we're looking at a lot of time. Now, on the overall scale of the sentences we see, we're not talking about a draconian kind of sentence here. But we could be. We could be talking about an incapacitative sentence, especially in the realm of incapacitation. I really want to hear from that defendant, and as I said, I want to hear from the support mechanism. If the defendant's kids are there, I want to hear from those kids. If the neighbors are there, and I've had cases like this where people who were lifelong drug addicts, and I would agree that... Excuse me, we're having some difficulty with Judge McKee's audio right now. We lost you there for just a moment, Judge McKee. Your last portion. Yeah, can you repeat whatever you're... Oh, now we're not hearing you at all. There's considerable distortion. Do we know at all why, Greg? All right, let's... Judge McKee, could you... I mean, we'll just stand by if you would disconnect and then reconnect, because we're not really hearing you at all right now. Yeah, sure. All right, we've got the disconnect part. Yeah, he should be back in a few moments. Advocacy in the light time of COVID. Thank you. This seems like a very long time. If he may have needed to restart his... His computer, which might be the reason why it's taking a couple of minutes longer. Well, I can assure you that as well as I know and understand my good friend, Judge McKee, he does like a little drama too, so maybe some of that. It'll just take a moment for the audio to connect. All right, Judge, can you hear me? I can, yeah. I hope I had tried to join with, I think, what was the public link. Hopefully, I'm on the right link now. We hear you very well. I was not seeing you, but the fidelity is... Trying to catch your break there, Chief. There you go. Well, it only lasted... There we go. All right, we see you and we hear you very well. All right, so I think you were in the course of asking a question, if you can remember what it was, Judge McKee. I can. It was long and protracted. Maybe Mr. Ramsey remembers. Do you remember, Mr. Ramsey? I believe the question had something to do with whether or not a defendant during an allocution could make comments that is essentially a request for leniency, because a judge like yourself, Judge McKee, would want to know certain information and to see how those facts impact your sentence. And I would say that this is very similar to Mr. Campbell's allocution, and where the government didn't even object to him talking about the rehabilitation he had gone through. I think that's because Campbell's situation was in response to defense counsel. I see that as being very, very different. I think counsel there was just blatantly in disregard of the plea agreement. That's different. I'm talking about a situation where the judge, on his or her own, makes the inquiry. But to respond to a judge asking those questions, in this case, Judge Thompson did ask questions like that, even before the defendant went to his defense counsel. And the government did not object to those responses. There were factors that the judge could consider as part of her analysis of where to sentence the defendant, whether that would be within the range or outside of the range. Well, and Judge McKee indicated, too, stated a few examples of what he would want to hear, and he has considerable experience as a trial judge, before coming to this court, that he would want to hear from maybe the children of a defendant. That he'd want to hear from family and neighbors. And the government would not contend that hearing from those folks was a violation of the plea agreement. Not at all, Judge. Okay. I didn't think so, but I just... That's helpful. Okay, that's helpful. Thank you, Chief. I see that my time is out, but... All right, we'll have you back on rebuttal, but after I ask just one question, and this is relative to the Campbell case. Campbell submitted a sentencing memorandum. And by my reading of it, in any event, my own, it appeared by itself to be suggestive of or even in breach of the plea agreement, by what it asked. But there was no objection interposed by the government in response in any way, not in its own submission of a memorandum or any other way. Did the government, as a consequence, either waive or forfeit the argument of breach? Even if that were true, Judge, the defendant himself made remarks and counsel made remarks at the sentencing hearing that resurrected whatever we may have... So it's a new day once you get to sentencing. Correct. We'll have you back on rebuttal. Thanks very much. Thank you. Mr. Glazer. May it please the Court, Your Honors, David Glazer appearing on behalf of the defendant. I don't know how malleable the microphone is, but if you can move that a little closer, or maybe the removal of the mask will... Any better? That is better. May it please the Court, David Glazer, GLAZER, appearing on behalf of the defendant, Abdul Rashid Yusuf. Judge, a couple of things, Your Honors, that I just want to start off with. I think that Judge Hayden, in an effort to impose a sentence that she thought was appropriate, really conducted a scrupulous hearing in terms of her inquiry, not just of myself, but of the government, in terms of trying to get as much information, because she, as Your Honors are aware, she didn't have the entire case in this matter. She had, for some reason, my defendant, my client, and not the others. Right. And we understand that. We know the background. Since we've got kind of limited time... Sure. Well, I guess we don't. We can run further than we... My parking is the same, by the way. So here's the question. Is it okay for you, for any defense counsel, to, even if the district court is asking you questions, imagine the most obvious, where Judge Hayden or some other judge says to you, look, should I give a variance here, should I vary downward, should I depart downward? You just tell me straight up. If there were no plea agreement here, what would you be saying to me? Can you answer that question when you've got the plea agreement in place? Well, I'd have to concede it's a dilemma for a defense attorney. Sure, certainly. And I've done enough of these to know that, you know, you try to do the right thing, and you try to adhere to the plea agreement. I think in this particular circumstances, though, I'd be derelict, I think, if I didn't mention it. I mean, we didn't go into... I mean, the allegation is made that there's foul play here. And frankly, I take that personally, because anything that I said there I thought was consistent with what the record was in this case. I'm sure that's true. And I know you need to advocate specifically for Mr. Youssef. I don't discount that. But I'm actually trying to take you past that to the question that Chief Judge Smith was putting to Mr. Ramsey earlier. We're going to need to write here, and what we say is going to go beyond Mr. Youssef and beyond Mr. Campbell. How can we, understanding that plea bargaining is the only thing that we can do, how can we go beyond Mr. Youssef and beyond Mr. Campbell? It is essential to the system we've got, whether anybody likes it or not, it's essential. How can we maintain the incentives on both sides to bargain in good faith if we, in essence, open the door for one side to walk away from a key element of the plea agreement? That is, not advocating in any way for a sentence outside of an agreement. That is, not advocating in any way for a sentence outside of an agreement. So I understand you're advocating for Mr. Youssef, but try to step away, Mr. Glazer, for a moment from the specific facts here and help us understand how to deal with that dilemma. Because it is a dilemma. We recognize that defense counsel has a dilemma. How do you suggest we instruct a district court to proceed and defense counsel to proceed when you're in that spot where the tension is acute? Well, you know, I'd like to think that, you know, sentencing is such an important activity that it shouldn't be about, you know, gotcha moments, you know, you don't say this, you don't say that. I think if a court makes an inquiry... Sure, and we know that, and all three of the members of this panel have been trial court judges. So we've been in those trenches and also in other positions, not just judging in those trenches. But having been presented with the dilemma, as you characterized it, and as Judge Jordan has framed his question, should the response of defense counsel be, at least in the first instance, your Honor, I have, along with my client, entered into a plea agreement. The plea agreement says this, and it constrains what I am able to say. I consider myself bound by that plea agreement. Is that satisfactory, Your Honor? I think that would be appropriate. I don't have a problem with that, and I think that's the way I started off here. I said there is a plea agreement, and if you look back to the hearing with Adekunle, the co-defendant, when Ms. Barrett was confronted with the same dilemma, I submit, where her client, they had a plea agreement. The same case that for some reason got sentenced before the other judge. And she started off saying, well, I know there's a plea agreement, and yet she came out and asked for something specifically below the plea agreement. So I think that's, frankly, I think that would be sufficient. And in that case, ironically, in that case, and this is part of the problem that I have when I say foul play, Mr. Kogan, who was the same prosecutor for my case and for her case, said, she's entitled to a plea agreement. I'm entitled to say that. I expect her to say that. I mean, that's what he said on the record. And that's what, frankly, when I was preparing for my, for any comments that I might make in court and what I might be asked by the court, I hadn't seen the transcript of that hearing beforehand when I had submitted my memo. I knew what the sentence was, but I hadn't seen the transcript. When I saw the transcript, I said, you know, I didn't think that I would have the problem from Mr. Kogan that I ended up having, because I started off saying that there is a plea agreement. And then I made my comment, which were the same kinds of comments that Ms. Barrett said at the Adekunle sentencing. That's an interesting and a significant point. It's not in the record we have. If I could ask the indulgence of my colleagues for a moment, would you mind if we got a supplemental submission? I think you do have the transcript. I'm sorry. I believe you do have the, yeah. Adekunle? Yes. Yes, that's the May 30th of 2018 sentencing. Then I apologize. Where this is stated, the very thing that you're saying, where he says on the record, I would expect you to say that. Exactly. Okay, then maybe you could just help me with a 28-J letter that just says, this is where that passage takes place. Because you don't have to do it right now. I just would like to know, and that raises this important question, which is, yeah. In your specific case, maybe there's something that arises that amounts to the government being stopped from complaining. That's essentially what it sounds like you're arguing. They shouldn't be heard to point the finger at me when they agreed to this in a different case. But again, I'm asking you to step beyond this case and speak to the kind of, you know, where the lines get drawn. Assume for the sake of discussion that you didn't have this weird split between two district court judges. And this is another issue that is puzzling to me as well. You're all in front of the same judge. What is it that you say as a, what should we say to defense counsel? Assume we thought Counselor Campbell stepped past the line. But can you, in answering a Judge Hayden's questions, go beyond simply saying, hey, look at this disparity? Can you start saying, given that disparity, we should have only two months? I mean, can you start advocating specific sentences? You know, I can speak about it, because I was confronted with it. That's exactly what I think I was confronted with. He got the two months, and now my client was already beyond that. And I think that under the circumstances, you know, I think you could be inclined to seek something that would, and specifically, I mean, and that's what I ended up doing. If you look at the record, I said he got two months, my client already is going to get five months. So that's two and a half times. So you're saying you would have said that no matter what the AUSA had said in the other sentencing? Because what you're telling me now is it wouldn't have mattered whether a different defense lawyer in a related case had argued for something without objection. You would have done what you would have done anyway. Is that right? Well, again, I was somewhat emboldened by what I had seen happen at the other sentencing. Yeah, that's why I'm trying to take that out of the mix. We're going to talk to judges, we're going to talk to defense lawyers in this opinion, and people are going to want us to draw some kind of a line. Where do we draw that line? I'm going to be guided clearly by what the court says. And if the court asks me, you know, I think the court is giving me the opportunity to respond. And if the court asks me, you know, I know there's a plea agreement and you're addressing that and you're mindful of that. However, I think this information is something that I should be considering at the time of sentencing. Would it be the same if it weren't after arising facts? Assume, you know, you've got the position, the unusual position in Eustis' case of being able to say, look, this thing happened after we entered into the plea agreement. So it's a new fact, and this you should be aware of it and let me tell you about it. What if that hadn't been the case? What if the facts we're talking about were the kinds of things that Judge McKee was asking about, stuff that's historical and happened before the plea agreement? Can you get up and say, look, Judge, I know we agreed to this thing, but let me tell you about what a good person this man has been in other areas of his life, and et cetera, et cetera. And saying, and we want leniency. I mean, we know we agreed to the guideline range, but look at these other things, really, and the 3553A factors. Is it really right? Is this really fair? Is it really good to have this guideline range when he's been such a great husband and father and et cetera, et cetera? Well, you may be going too far, I think, in terms of the plea agreement. You know, I get that, but I think that if indeed there were compelling circumstances, as I think there were in our case, I think it has to be addressed. And I don't think it's fair for the prosecutor to kind of sit in the background and stand up like, gotcha, you know, you're breaching the plea agreement. When he's been a part of the entire background of this case, the proceeding, he knows what's happened. It's not a surprise to anybody. As Mr. Ramsey said, everybody knows, at that point, everybody knew what had happened with the co-defendant. But I realize, you know, you're looking at policy decisions here, and I guess, you know, for me it hasn't come up that often in terms of this kind of thing. But I think that if a court is, you know, has some concerns about something and there's a plea agreement and the court poses the questions to me, I don't necessarily see a problem that I'm going to, you know, step out of my bounds. Judge McKee, any further questions? I have nothing. Thank you. No, thank you. Thank you very much. Thank you. Thank you. Mr. Murphy. Please, the court. James R. Murphy on behalf of Stephen Campbell. Your Honor, with regard to Mr. Campbell, I would just like to say that that. I believe that what I was attempting to do was highlight the thirty five fifty three factors with regard to Mr. Campbell, as well as the an allocution on his part with regard to questions that were previously that I had used in other similar cases that I'd learned from Mr. Campbell, from attending a CGA conference, trained by the United States Office of the Administrative Office of the Court. So this was a series of questions that was developed by them and utilized by me. But I mean, you don't you're certainly not suggesting, are you, Judge Thompson, who has been an Article three judge, that this I think since nineteen seventy nine needed to be reminded of the existence of the thirty five fifty three. No, Your Honor. Absolutely. Absolutely not. I'm just simply saying that that that is as an advocate. Look, what ninety nine ninety five percent of the practice of people who before the federal bar in criminal cases are doing are sentencing because ninety five percent of the cases are pleas. So that's exactly what we do. We we enter pleas and we make an argument for our client with regard to you. You entered the plea. That's here's the curious thing for you. You had agreed and stipulated to this range. But then you went into court and said this guy shouldn't get jail time. This guy should get probation, which was I mean, how do you square that circle? That was how how could that be? How could that be consistent with the plea agreement that was entered? The actual words used by my client were I would hope that the court would hope that Your Honor would consider probation in my in my in my. What was that in response to? That was a response to a question. Will you say what is a just punishment for your offense? I'm looking at the sentencing transcript. That question, frankly, it blew my mind when I read that, that you would ask your client that question given this plea agreement. I'm not sure what the remedy is, but it's a different way to get into that. But that really to me, I don't know how how you can argue you did not breach the agreement. And we can get into the remedy. But to ask your client, well, that's a just punishment for your offense. That's ridiculous. I don't I can only again say, Your Honors, that that I have done two pleas within the last month where it's emphasized to the client in federal court that, by the way, even though you've entered into this plea agreement, I have the final word as to what sentence you can get. It can be above and beyond the guidelines. It can be above the guidelines. It can be below the guidelines and they are triggered by the thirty five fifty three factors, which the court court district court is obviously well aware of, as well as the ability of of a client to allocute under under the under rule thirty two. So that's what I was attempting to do. Didn't Judge Thompson herself even suggest, if not declare that a breach had occurred here? She had. She certainly implied that that would have been better had I not. No, no, no. I didn't say that she characterized what occurred here has as being preferable or not. I understood from my recollection of reading the transcript that she actually believed that a breach had taken place. Am I wrong? I don't I don't believe that was the. All right. That's not my interpretation of what occurred in that courtroom that day. What do you make of the words the parties agree not to seek or argue for any upward or downward departure, adjustment or variance not set forth herein. Neither party will argue for the imposition of a sentence outside the guidelines range. The results from the agreed total guidelines offense level. Well, clearly, that's not what I was attempting to do. I was just simply attempting to present facts that the court under thirty five fifty three, that the judge could make an independent decision as to what sentence was this particular client. Deserved under your client. What is the just punishment? That's not a factual inquiry at all. No facts there. Well, in the sentencing memorandum, we did present his ties to the community. One hundred and twenty people signed an agreement, signed a petition that he be given leniency. There were numerous photographs of his contributions to the local community. There were additional 15 letters of support for him. And I thought all of these were important to present to the court by way of mitigation in terms of any sentence that he was to was to receive. Sure. You're allowed to argue, given your plea agreement, within the bounds of the sentencing guideline range. And all those things could have been argued perfectly consistently with the plea agreement by saying, look at all these important and great things. He should get a he should get a sentence at the very bottom of the range. But once you start introducing the idea that he should get a sentence outside the range, I'm struggling with how that how that can be consistent with what you and your client put your hand to on the plea agreement. I just reiterate that all I was attempting to do and my client was attempting to do was for her honor to have a full picture of his situation and for her to strike a sentence that she felt was appropriate on all the intended circumstances. OK. Anything further, Judge McKee? Nothing further. Thank you very much, Mr. Murphy. Mr. Ramsey, you have rebuttal. The first issue, if there are no questions from the court, I wanted to address is this idea of gotcha moments. Yeah, we're getting the gotcha remedy. If we send it back with orders to enforce the plea agreement, well, then since we're turning this into a rule C, subsection C plea, the judge is going to retain and I think should retain discretion knowing what she knows in both cases to impose an appropriate sentence. So, aren't we then basically stepping in and we're becoming the sentencing court because we're superseding what the judge might want to impose irrespective of the breach. Let's assume no breach had occurred and Judges Hayden and Thompson would have looked at the circumstances and said, well, there's a plea agreement, but I just think the bottom of the range is too severe here. I'm going to go below that. She clearly could have done that. We're telling her if we ask for a specific performance that she cannot do that. That troubles me. Well, the specific performance we're asking for in accordance with this circuit's rule is that this go before a different sentence. Williams requires, does it not, that this case go back and be reassigned to a different judge. Correct. And if that happens, there's going to be, you're saying, a chance for that judge to depart or to vary if that judge feels it's appropriate. Correct. Okay. Speaking of this gotcha issue, we understand that, you know, the Department of Justice is a big place. Decisions get made up and down the chain of command. In Mr. Yusuf's specific case, is he factually correct when he says to us, look, the co-defendant got sentenced and there was an advocacy that was straight up, hey, go outside and not a peep out of a U.S. Attorney's office there. I came in, I did something which was, I thought, frankly, not even that extreme. I just was responding. And they say, ah, breach. So deal with the factual piece. Is he correct that the co-defendant's lawyer said things that weren't complained of and that aren't in front of us on appeal, but suddenly he is? Is that factually accurate? Well, Judge, this is something that we've explained on our reply brief on pages 11 and 12. And the issue that we had in Mr. Adekunle's case is that Mr. Yusuf's original sentence was an erroneous sentence. So it wasn't clear whether a breach had occurred in Mr. Adekunle's sentencing at that time. Okay. We've got the briefs. We've read the briefs. The question I'm trying to ask, well, maybe it's not different. It's slightly different. What I'm hearing Mr. Glazer say is a reasonable person in my position, a defense lawyer, looking at that would understand and think, I'm free to say the kinds of things I'm about to say. And having gone in and said those things, it ill behooves the government to say, well, you can't do that. Specific performance. I mean, that's – he didn't quite put it in terms of a stopple, but is there something akin to that going on here where if a co-defendant sentencing results in or includes statements of the sort that he makes and there's no objection, you shouldn't be heard to object in his? Well, these are co-conspirators. They weren't co-defendants. So they're two different matters. Granted. Thank you. Thank you for that clarification. Keep it that way. Co-conspirators. But because of that, I mean, even if a breach occurred in that case and we weren't quick to identify the breach in Mr. Adekunle's case, that doesn't excuse the breach in this case. Well, that's in fact the very question I'm asking you. Does it excuse the breach in this question, right? Does it excuse the breach here because there is a sensible or a reasonable reliance on the part of defense counsel in looking at how the co-conspirator was treated? Well, I guess the court is asking a question about conduct with the government. But we still have a plea agreement. And if the government didn't catch the breach in one instance, that doesn't mean that a breach didn't happen in another instance. There are two different plea agreements, two different sentencing hearings. And the issue that we had in calling the breach in Mr. Adekunle's case because, again, there was an erroneous sentence with Mr. Yusuf, and now that we're resentencing. I hope this doesn't sound trite. But given the very blatant disparity in treatment here that has been referenced in the questions, doesn't it seem to you just a bit unfair to have that result, given what would seem to be the reasonable reliance that was experienced by counsel for Yusuf? Maybe fairness, unfairness is just too squishy a term, but doesn't it strike you that way? The unfairness from the government's perspective comes from the fact that Mr. Yusuf now is trying to profit from an erroneous original sentence. And so that is causing a tension throughout the entire, from Mr. Adekunle's sentence all the way to where we are now. Here's, you know, not to put too fine a point on it. Sometimes when people say with all respect, you think they mean the exact opposite. But I don't. With all respect to defense counsel who have very difficult jobs and to prosecutors who have challenging jobs as well, I have just been puzzled why, you know, why you weren't content as the government to come in here with Mr. Campbell's case, which seems to be one where the government doesn't have these other factors in play and could make the pretty straightforward argument that if you come into court when you've got a plea agreement and say, hey, give us probation, that's a problem. But here with the Yusuf case, you've chosen to fight on the ground, which is just hard for me to understand why that's the battleground you guys picked. And maybe that's an unfair question to put to you, but it is a little puzzling. I mean, do you see a difference between the Campbell situation and the Yusuf situation? Does it look to you like that's exactly the same set of facts, like the same sort of things in play? Well, certainly one case is more obvious than the other, but that doesn't excuse the fact that a breach occurred in Mr. Yusuf's case, even if it's an implied breach. In one sense, it's good for you to have done it because, you know, it does put a harder case. But from the government's perspective, that might mean you get a decision or an opinion that's not quite as straightforward as you might like. But, you know, I don't know. I don't know how this is going to work out. It just seems you've teed up the issue with the Yusuf case in a way that requires a good deal more balancing and statements about government obligations than you would have had had you just run with Campbell. Prosecutorial discretion is not prosecutorial infallibility, I guess. Anything further, Mr. Ramsey? Judge McKee, anything further? Nothing. No, thank you. Thank you, Judge. Nothing further from the government. We just ask that the Court would vacate the sentences and remand for de novo resentencing before different judges. Thank you. We thank all of counsel very much. These are important matters that some of our questions certainly suggest raise issues of concern and issues of policy that extend beyond the two cases before us.